UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MONSTER CABLE PRODUCTS, INC.,                    No. C 04-0005 MHP

               Plaintiff,

    v.                                        **MEMORANDUM AND ORDER**
                                              **Cross-Motions for Summary Judgment**

THE QUEST GROUP d/b/a/ AUDIOQUEST,

               Defendant.

_____/

Plaintiff Monster Cable Products, Inc. filed this action alleging patent infringement against defendant The Quest Group, d/b/a/ AudioQuest ("AudioQuest"). The complaint alleges infringement of United States Patent No. 5,307,416 ("the '416 Patent"), technology relating to audio cable technology. Now before the court is defendant's motion for summary judgment, or in the alternative, for summary adjudication of noninfringement. Plaintiff opposes this motion and cross-moves for summary adjudication of infringement. Having fully considered the parties' arguments and submissions and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

I.      The Patented Invention

The patent at issue in this infringement action relates to an audio cable technology invention developed by Demian Martin in 1991 and 1992.[1]  The '416 Patent, issued on April 26, 1994, describes a "bias circuit for cable interconnects."  The patent discloses a circuit and method for improving the accuracy of electrical signals communicated between electrical devices.  The invention is directed towards electrical equipment, such as high fidelity stereo equipment, that reproduces audio signals, either analog or digital.  In order to improve sound quality, the invention is designed to reduce noise when an audio signal approaches and passes through zero.

The '416 Patent describes two methods: a circuit apparatus (claim 1) and a biased cable apparatus (claims 2 through 5).  The first method involves applying a bias voltage across the first and second conductors of a cable connecting two electrical devices and isolating these devices from the bias voltage.  The second is an apparatus for communicating a digital electrical signal to an input of a second electrical device on a coaxial cable with a center conductor and a conductive shield.  A digital signal, which has a voltage that changes with respect to an approximately constant ground voltage, is input on the center conductor of a coaxial cable.  The apparatus applies a bias voltage with respect to ground to the conductive shield of the coaxial cable, such that the digital signal passing through the coaxial cable is biased with respect to the voltage source and to the ground reference.  The patent explains that the invention improves signal accuracy by creating an electrostatic effect at the electron level, or based on mechanical force exerted by the electrostatic bias which improves the linearity of the system.  The embodiment of the bias circuit apparatus described in the patent is particularly applicable to digital signals, though it can also be used for analog signals.

In 1990, Martin joined Crosby Audio Works, the first assignee of the '416 Patent.  Crosby manufactured and marketed the circuit apparatus embodiment of the invention during the early to mid-1990s.  Martin joined Monster Cable in 1996, and the company purchased the rights to the '416 Patent.  Neither Crosby Audio Works nor Monster Cable has ever built the biased cable apparatus described in the patent's specification.  In the present action, Monster Cable alleges that AudioQuest

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1  has begun marketing biased cables which infringe on the biased cable apparatus of the '416 Patent,

2  defined in claim 2 and dependent claims 3 to 5.

3        In relevant part, the '416 Patent makes the following claims:

4      2.      A biased cable apparatus for communicating a voltage varying
   electrical signal from an output of a first electrical signal to an input of
5  a second electrical device on a coaxial cable having a center conductor
   and a conductive shield; said electrical signal being provided by a
6  single line and an approximately constant ground reference voltage, the
   apparatus comprising:
7          means for applying the electrical signal from the single line to the
           center electrode;
8          ground reference means for maintaining the output of the first
              electrical device and the input to the second electrical device at
9             approximately the same ground reference voltage; and
           bias means for applying an approximately constant bias voltage to
10            the conductive shield of the coaxial cable with respect to the
              ground reference voltage said bias voltage being larger than any
11            peak-to-peak voltage of the voltage varying electrical signal.

12     3.      The biased cable apparatus of claim 2 wherein the ground reference
   means includes a ground reference line connected between the output
13 of the first electrical device and the input to the second electrical
   device.

14

15     4.      The biased cable apparatus of claim 3 wherein the bias means includes
   a voltage source coupled between the conductive shield and the ground
   reference line.

16

17     5.      The biased cable apparatus of claim 3 wherein the bias means includes
   means for supplying a bias voltage that is greater than the peak voltage
   of the electrical signal.

18 '416 Patent, col. 9, lines 27-29, col. 10, lines 1-29.

19

20 II.   The Accused Devices

21       Quest has moved for summary judgment of noninfringement on twenty-nine of its audio

22 cables.  Each of these cables relies on AudioQuest's Dielectric Bias System ("DBS") technology, but

23 the cables vary in terms of the arrangement, quantity, and type of their conductors, as well as in the

24 application of voltage within the cable.  The accused devices can be divided into a number of

25 product "families."  Unless otherwise noted below, the products within each family may vary slightly

26 in the type of metal or insulation used.

27       AudioQuest's original Analog Interconnect Cables (the Original Panther, Jaguar, Cheetah,

28

1   and Sky cables) have the following conductors: three signal conductors (surrounded by an air gap

2   and insulation), an un-insulated drain conductor, a "Power Anode" (surrounded by insulation), and

3   an aluminum foil or copper foil layer.  Harley Dec. ¶¶ 6, 11-13.  These cables are sold as balanced

4   (using two separate conductors, one positive and one negative, to carry an audio signal) or

5   unbalanced (using one conductor to carry the audio signal).  Id. ¶ 5.  The cables also include a battery

6   pack that provides a DC voltage, with the positive terminal of the battery connected to one end of the

7   Power Anode and the negative terminal connected to one end of the drain conductor.  Id. ¶ 9.  The

8   other end of the Power Anode is "floating" (i.e., not connected to anything), while the other end of

9   the drain conductor is connected to the terminal connectors for the cables (XLR in the balanced

10  cables, RCA in the unbalanced cables).  Id.  The drain conductors and aluminum foil or copper foil

11  are at ground.  Id. ¶ 10.  AudioQuest's website describes the DBS system application in the Original

12  Jaguar cable as follows: "Greatly improved performance is made possible by a constant 36 volt

13  charge on all Jaguar's insulation. As 36 volts is far above the voltage of an audio signal, the result is

14  considerably more transparency and dynamics than possible even from a cable in continuous use,

15  with equipment that is never turned off."  Harley Dec., Exh. B.  The descriptions for the other cables

16  in this family are similar, except that the Sky cable uses a 72 volt charge on the insulation.  See id.,

17  Exh. D, F, H.

18      The second product family is a newer generation of analog interconnect cables (the New

19  Panther, Jaguar, Cheetah, and Sky Analog Interconnect Cables).  Id. ¶ 15.  These have the following

20  conductors: three signal conductors (surrounded by an air gap and insulation), a "DBS Cathode," an

21  un-insulated drain conductor, an un-insulated "DBS Anode," and inner and outer layers of aluminum

22  foil or copper foil.  Id. ¶¶ 15, 20-22.  Like their original versions, these cables are sold as either

23  balanced or unbalanced, with XLR or RCA conductors.  Id. ¶¶ 16, 19.  The battery which provides

24  DC voltage to these cables has a positive terminal connected to one end of the DBS Anode and a

25  negative terminal connected to the DBS Cathode.  Id. ¶ 18.  The opposite ends of the DBS Anode

26  and Cathode are floating.  Id.  The inner aluminum foil layer is at ground, as is the drain conductor.

27  Id. ¶ 19.

28

4

The Sub-3 cable is also a type of analog interconnect cable. Id. ¶ 23. It is used to connect a receiver, processor, or preamp to a subwoofer. Id. The Sub-3 includes the following conductors: three copper signal conductors (surrounded by an air gap and polythylene insulation), a Power Anode, two un-insulated copper drain conductors, an inner aluminum foil layer (in electrical contact with one of the drain conductors and surrounded by insulation), and an outer aluminum foil layer (in electrical contact with the other drain conductor). Id. ¶¶ 23, 25, 26. The Power Anode is located inside of a three-pronged polyethylene insulator. Id. ¶ 23. It is sold balanced or unbalanced. Id. ¶ 24. The battery of the Sub-3 has a positive terminal connected to one end of the Power Anode, with the other end of the Power Anode floating, and the negative terminal of the battery is connected to one end of the outer drain conductor. Id. ¶ 27. The inner aluminum foil and inner drain conductor are both at ground. Id. ¶ 29.

The fourth product family includes four AudioQuest speaker cables, called the Original Kilimanjaro, Mont Blanc, and Pike's Peak Speaker Cables. Id. ¶ 30. The conductors in the cables include: an insulated conductor in the middle of the cable, five separate insulated conductors placed around that conductor to form a "flower pattern" of conductors, and five more separate insulated conductors placed outside of the flower of conductors. Id. The cables do not have aluminum foil layers or drain conductors. Id. The outer flower conductors are the negative conductors and are each connected to the negative terminal of a battery and the "negative" signal. Id. ¶ 31. The positive terminal of the battery is connected to one end of the middle conductor, which is not electrically connected to any other conductors in the cable. Id. The inner flower conductors are positive conductors that carry the audio signal. Id. ¶ 31.

The new generation of that group of speaker cables (called the New Original Kilimanjaro, Mont Blanc, and Pike's Peak Speaker Cables) have the same conductors as the original cables, with the addition of an aluminum foil layer surrounding the outer sets of conductors and fillers, as well as an un-insulated drain wire. Id. ¶ 33-34. These cables' batteries have a slightly different configuration, with the negative terminal of the battery connected to one end of the insulated middle conductor, and the positive terminal connected to one end of the drain conductor. Id. ¶ 35.

5

In AudioQuest's Original Volcano and Everest Speaker Cables, the center of the cables are a foam core surrounded by an aluminum foil layer. Id. ¶ 37. This aluminum foil layer is in electrical contact with an un-insulated drain conductor connected to the positive terminal of the battery. Id. Eight insulated conductors (positive conductors) are placed in groups of four outside the aluminum foil, with two fillers separating the groups. Id. ¶¶ 37-38; Exh. X. Outside that layer of conductor groups is a non-conductive binder and eight insulated conductors (negative conductors) and eight fillers placed in alternating groups of four. Id. The positive conductors are connected to the positive terminal of the battery and the negative conductors connected to the negative terminal. Id. ¶ 38. The AudioQuest materials describing the DBS technology on these cables states:

> Unfortunately, because insulation stores and releases energy, it is also a 'dielectric.' In a cable application, all released energy is distortion. The misnomer 'break-in' is often used to describe the pronounced improvement in performance as the dielectric adapts to a charged state as the cable is used. Whenever a cable does not have a charge on it, it is re-adapting to an uncharged state; it is becoming new again. By maintaining a 72 volt dielectric-bias, far above the voltage of delicate audio signals, the DBS system provides considerably better transparency and dynamics than is possible even from a cable in continuous use.
> Id., Exh. Y, AA.

The new generation of the Volcano and Everest Speaker Cables has an insulated conductor in the middle of the cable which is connected at one end to the negative terminal of a battery and floating at the other end. Id. ¶ 40. As in the Original Volcano and Everest Cables, these cables have eight insulated conductors and fillers placed in groups of four, forming a layer that is surrounded by a non-conductive binder and then an outer layer of eight insulated conductors and eight fillers, again arranged in alternating groups of four. Id. The insulated conductor in the middle of the cable is not electrically connected to any of the conductors in the inner or outer layers or to the aluminum foil. Id. ¶ 41.

The CV-4, KE-4, CV-6, and KE-6 Speaker Cables also have an insulated conductor in the middle of the cable that is connected at one end to the negative terminal of a battery but otherwise not electrically connected to any adjacent conductors or layers. Id. ¶ 43-45. Four (or eight, in the latter two cables) insulated signal conductors are placed adjacent to this middle conductor, two (or four) of which carry a positive signal, two (or four) a negative signal. Id. Outside of the conductors

is a layer of aluminum foil, which is in electrical contact with an un-insulated drain conductor connected at one end to the positive terminal of the battery (the other end of the drain conductor is floating).  Id.

The Gibralter and Rockefeller Speaker Cables include two cable "portions" that each have seven conductors.  Id. ¶ 46, 48.  Each portion has an insulated conductor in the middle, with one end connected to the negative terminal of a battery and the other end floating, but which is otherwise not in electrical contact with any other conductors.  Id. ¶¶ 47-48.  Adjacent to that middle conductor are four insulated conductors, two of which carry a negative signal and two a positive, interleaved with a set of cotton fillers.  Id.  Outside of this layer is an aluminum foil layer, and each cable portion has an un-insulated drain conductor that runs along the cable in electrical contact with that aluminum foil layer.  Id.  One end of the drain conductor is connected to the battery's positive terminal, while the other end is floating.  Id.

The Raven Digital Interconnect Cable is a balanced cable.  Id. ¶ 49.  In the middle of the cable is an insulated conductor with one end connected to the negative terminal of a battery and the other end floating.  Id.  Adjacent to the middle conductor are three insulated conductors interleaved with three fillers.  Id.  Of these three conductors (each of which is connected to one XLR connector pin), one conductor is the positive signal conductor, one the negative signal conductor, and the third is associated with ground.  Id.  These three conductors are surrounded by conductive materials and insulation, which are in turn enclosed by an aluminum foil layer.  Id.  An un-insulated drain conductor (with one end connected to the positive terminal of the battery and the other end floating) runs along the length of the cable in electrical contact with the aluminum foil layer.  Id.  The DBS system in the Raven cable is marketed in AudioQuest's website brochure this way:

> When insulation is un-biased, its dielectric properties cause different amounts of time-delay for each frequency and each signal level.  Similar to how the earth's magnetic field makes all compasses point north, the AQ DBS system creates an electrostatic field which causes the molecules of the insulation to all point the same direction.  This minimizes the multiple nonlinear time-delays.  Corruption of time domain information in a digital audio signal is known as 'jitter' … a primary distortion mechanism limiting intelligibility and causing artifacts (irritation) in the sound.
> Id., Exh. MM.

1       The Hawk Eye and Eagle Eye are also Digital Interconnect Cables.  Id. ¶ 50.  They have a

2   conductor in the middle of the cable, an un-insulated drain conductor, an outer aluminum foil layer, a

3   conductive PVC layer, a silver-plated copper layer, and a copper foil layer.  Id.  The middle

4   conductor is used to carry an audio or video signal and is connected to the negative terminal of a

5   battery and the center pins of RCA connectors.  Id. ¶ 51.  This insulator is surrounded by a

6   conductive PVC layer and copper and foil layers which connect to equipment ground through the

7   shells of the RCA connectors located at the ends of the cable.  Id.  An un-insulated drain conductor

8   (with one end connected to a positive terminal of a battery and the other floating) runs along the

9   cable in electrical contact with the outer aluminum foil layer.  Id.

10       The final AudioQuest product is the Leopard Tone Arm Cable.  Id. ¶ 53.  This cable has an

11   insulated "drain" conductor at the middle of the cable that is connected at one end to the positive

12   terminal of a battery, the other end is floating and not connected to anything.  Id. ¶ 54.  The drain is

13   juxtaposed between four insulated conductors (left negative, left positive, right negative, right

14   positive) and four cotton fillers.  Id.  Outside of the four conductors are a conductive PVC layer and

15   a tinned copper layer, the latter of which is electrically connected to the ground chassis of the tone

16   arm, the ground chassis of the stereo component, and the negative terminal of the battery.  Id.

17

18   III.    Procedural History

19       Following a Markman hearing held on March 15, 2005, this court issued an order construing

20   six terms used in the disputed claim 2 of the '416 Patent.  See March 18, 2005 Claim Construction

21   Order.  That order construed the term "coaxial cable" as a "cable with two conductors that share an

22   axis."  The court construed "center conductor" as "a conductive material which is enclosed by the

23   conductive shield of a coaxial cable and which carries the voltage varying electrical signal."  As for

24   the term "conductive shield," the court construed the term as an "outer conductor that reduces the

25   effect of external electrical interference on the voltage varying electrical signal transmitted on the

26   center conductor."  The court found that the term "applying" (in the context of "applying an

27   approximately constant bias voltage. . .") did not require further construction, but rather would be

28

8

obviously understood as conducting voltage.  In addition to these terms, the court adopted the parties' agreed upon constructions, including their construction of "ground reference voltage" as "the approximately zero voltage level or potential against which the 'electrical signal' and 'bias voltage' are established and measured."  Finally, the court found that only the agreed structures depicted in figure 9 of the patent performed the functions claimed by the "bias means" and "means for supplying a bias voltage that is greater than the peak voltage of the electrical signal" terms of the patent.[2]

On May 16, 2005, defendant filed a motion for summary judgment of noninfringement of the '416 Patent with respect to all of the AudioQuest products at issue, or in the alternative, for summary adjudication of noninfringement on the asserted claims of the '416 Patent with respect to certain products.  Plaintiff opposes this motion and cross-moves for summary judgment of infringement with respect to all claim limitations.  The following memorandum and order addresses both of these motions.

LEGAL STANDARDS

I.      Summary Judgment

As in any other civil action, summary judgment is proper in a patent infringement action when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the nonmoving party.  Id.

The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325; Crown Operations Int'l, Ltd. v. Solutia,

1   Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002).  On the other hand, where the moving party bears the

2   burden of proof on an issue, it must submit evidence sufficient to establish that no reasonable jury

3   could find against it on that issue at trial.  See Frank's Casing Crew & Rental Tools, Inc. v.

4   Weatherford Int'l, Inc., 389 F.3d 1370, 1376 (Fed. Cir. 2004); Gart v. Logitech, Inc., 254 F.3d 1334,

5   1339 (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002).

6

7   II.     Patent Infringement

8          Under section 271 of the Patent Act, 35 U.S.C. § 271, liability for patent infringement may be

9   imposed on any person who without permission of the patentee "makes, uses, offers to sell, or sells

10   any patented invention[] within the United States or imports into the United States any patented

11   invention during the term of the patent therefor."  Id.  The rights granted to the patentee are defined

12   by the patent's claims.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996).  In

13   determining whether an allegedly-infringing device falls within the scope of the claims, a two-step

14   process is used: first, the court must determine as a matter of law the meaning of the particular claim

15   or claims at issue; and second, it must consider whether the accused product infringes one or more of

16   the properly construed claims.  Id. at 384; Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336,

17   1344 (Fed. Cir. 2002).  The second inquiry is a question of fact, although summary judgment of

18   infringement or noninfringement may nonetheless be appropriate when no genuine dispute of

19   material fact exists.  Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1299 (Fed. Cir.

20   2004) (quoting Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998)).

21          The patentee bears the burden of proving infringement by a preponderance of the evidence.

22   Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991).  This burden can be met by

23   showing that the patent is infringed either literally or under the doctrine of equivalents.  See Linear

24   Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1318 (Fed. Cir. 2004).  To support a finding of

25   literal infringement, the patentee must establish that "every limitation recited in the claim appears in

26   the accused product, i.e., the properly construed claim reads on the accused product exactly."

27   Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1382 (Fed. Cir. 2000) (citing Amhil Enters. Ltd.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996)).  Alternatively, where one or more elements of

the claim are not literally present in the allegedly infringing product or process, infringement may

nonetheless be found under the doctrine of equivalence if the differences between the accused device

and the patented invention are "insubstantial." Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.,

370 F.3d 1131, 1139 (Fed. Cir. 2004) (quoting Eagle Comtronics, Inc. v. Arrow Communication

Labs., Inc., 305 F.3d 1303, 1315 (Fed. Cir. 2002)).  As with literal infringement, the inquiry into

whether infringement may be found under the doctrine of equivalents requires an element-by-

element comparison of the patented invention and the accused device. Warner-Jenkinson Co. v.

Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997).  Consequently, in applying the doctrine, the court

must consider whether the accused device "contain[s] elements that are either identical or equivalent

to each claimed element of the patented invention." Id.; EMI Group N. Am., Inc. v. Intel Corp., 157

F.3d 887, 896 (Fed. Cir. 1998), cert. denied, 526 U.S. 1112 (1999).

Under the classic formulation of the doctrine of equivalents set forth in Graver Tank &

Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605 (1950), a feature of the accused device

is "equivalent" to an element of claimed invention if it performs substantially the same function in

substantially the same way to achieve substantially the same result. Id. at 608 (citations omitted);

Schoell v. Regal Mar. Indus., Inc., 247 F.3d 1202, 1209-10 (Fed. Cir. 2001).  However, as the

Supreme Court subsequently acknowledged in Warner-Jenkinson, this particular "linguistic

framework" may not be appropriate in every case.  520 U.S. at 39-40.  Rather, the Court observed

that "[a]n analysis of the role played by each element in the context of the specific patent claim

[must] inform the inquiry as to whether a substitute element matches the function, way, and result of

the claimed element, or whether the substitute element plays a role substantially different from the

claimed element." Id. at 40.  A number of other considerations may also be relevant in determining

the range of equivalents to which the claimed invention is entitled, including the prosecution history

of the patent in suit, the pioneer status of the invention (or lack thereof), and the limitations on

patentability of the allegedly equivalent device that would have been imposed by prior art extant at

the time that the patent application was filed. See Intel Corp. v. International Trade Comm'n, 946

11

1    F.2d 821, 842 (Fed. Cir. 1991); K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1366-68 (Fed. Cir.

2    1999).

3

4    DISCUSSION

5    I.       The '416 Patent's Status as a Pioneer Patent

6           The parties' dispute whether the '416 Patent is a pioneer, entitled to a broad range of

7    equivalents, or an improvement patent.  This inquiry is relevant to the scope of equivalents due to the

8    claim limitations of the '416 Patent.  See Abbott Laboratories v. Dey, L.P., 287 F.3d 1097, 1105

9    (Fed. Cir. 2002) ("A pioneer patent by definition will have little applicable prior art to limit it,

10   whereas an improvement patent's scope is confined by the existing knowledge on which the

11   improvement is based").  A patent that issues in a crowded art cannot be considered a pioneer patent.

12   Chemical Engineering Corp. v. Essef Industries, Inc., 795 F.2d 1565, 1572, n.8 (Fed. Cir. 1986).

13   The '416 Patent indeed issued in a crowded field of audio cable technology, much of which sought to

14   achieve the same general purpose as Martin's patent: to improve the accuracy of electrical signals

15   communicated between electrical devices.  See, e.g., U.S. Patents Nos. 4,414,023 & 4,954,787 (both

16   cited as prior art in the '416 Patent).  See also U.S. Patent No. 4,177,431 (discussed in U.S. Patent

17   No. 4,954,787).  The '416 Patent referenced eight examples of prior art, and it required amendments

18   at the U.S.P.T.O.  See generally AudioQuest Req. for Judicial Notice.

19          The parties have raised a disputed issue over whether the '416 Patent's "bias means" element

20   was a pioneer in the field.  Though the concept of biasing conductors in a cable was known and cited

21   as prior art by the patentee, Monster Cable has provided an expert declaration from Dr. Barry A.

22   Blesser attesting that none of the references to prior art cited in the patent showed "either the

23   problem or the solution of the '416 Patent," which he identified to be that "without a bias, the

24   stresses on the dielectric oscillate with the changing sign of the audio signal, but with the bias, there

25   is no longer a change in sign because of the additive bias."  July 5, 2005 Blesser Dec. ¶¶  5, 8-23.

26   See July 5, 2005 Blesser Dec., ¶¶ 11-12 (discussing the biased conductors in U.S. Patent No.

27   3,763,482).  As an issue of fact, resolution of this issue would not be appropriate on summary

28

12

1  judgment as to the "bias means" element of the patent.  <u>Augustine Medical, Inc. v. Gaymar</u>

2  <u>Industries, Inc.</u>, 181 F.3d 1291, 1301 (Fed. Cir. 1999) (citing Sun Studs, Inc. v. ATA Equip. Leasing

3  Inc., 872 F.2d 978, 987 (Fed. Cir.1989) (noting that "no objective legal test separates pioneers from

4  non-pioneers," and that pioneer status "depends on all factual circumstances").  Nor is resolution of

5  the question necessary for the disposition of this order, where the question of equivalents on the

6  "bias means" functions is not reached.

7          However, there is no dispute in the record as to the diversity of cable geometries captured in

8  the prior art and the availability of complex arrangements of conductors to improve audio and other

9  cable technology.  The examples of prior art cited in the Patent included multiple conductor cables in

10  various configurations.  <u>See</u>, <u>e.g.</u>, U.S. Patent No. 4,538,023 at col. 3, lines 25-28 (referring to a

11  "cable consist[ing] of a plurality of conductors" in the context of audio cable technology).  While it

12  is ultimately true that the "peripheral claiming system itself . . . makes the best distinction between

13  pioneers and non-pioneers," and the "claim scope itself generally supplies broader exclusive

14  entitlements to the pioneer," the court nevertheless notes that it is undisputed that claim limitations

15  in the '416 Patent relating to conductor geometries are not pioneering aspects of the invention's

16  contribution.  <u>Id</u>.

17

18  II.      The Claim Limitations Described in Claim 2

19          Quest moves for summary judgment on the basis that no reasonable jury could find, either

20  literally or under the doctrine of equivalents, that the following limitations of claim 2 are present in

21  the accused devices: (1) a "coaxial cable," (2) a "center conductor," (3) a "conductive shield," (4) a

22  "means for applying the electrical signal," and/or (4) a "bias means."  Monster Cable disputes

23  whether the first three of these terms, which appear in the preamble of claim 2, should be considered

24  independent limitations of claim 2.

25          A preamble limits the claimed invention where it "recites essential structure or steps," or

26  otherwise gives meaning to the claim.  <u>Eaton Corp. v. Rockwell Intern. Corp.</u>, 323 F.3d 1332, 1339

27  (Fed. Cir. 2003).  "'[A] claim preamble has the import that the claim as a whole suggests for it.  In

28

13

1   other words, when the claim drafter chooses to use both the preamble and the body to define the

2   subject matter of the claimed invention, the invention so defined, and not some other, is the one the

3   patent protects.'" Id. (quoting Bell Communications Research, Inc. v. Vitalink Communications

4   Corp., 55 F.3d 615, 620 (Fed. Cir.1995)).  However, if deletion of the preamble phrase would not

5   affect the structure or steps of the claimed invention, the body of the claim describes a structurally

6   complete invention such that the preamble is generally not limiting unless there is "'clear reliance on

7   the preamble during prosecution to distinguish the claimed invention from the prior art.'"  See

8   Intertool, Ltd. v. Texar Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004) (quoting Catalina Marketing

9   Int'l, Inc. v. Coolsavings.Com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002).

10        In claim 2 of the '416 Patent, the preamble provides the antecedent basis for the terms coaxial

11   cable, center conductor, and conductive shield, as those terms are used in the body of the claim.  The

12   preamble does not merely introduce "a biased cable apparatus comprising," as Monster Cable has

13   repeatedly suggested.  Instead, it introduces "[a] biased cable apparatus for communicating a voltage

14   varying electrical signal from an output of a first electrical device to an input of a second electrical

15   device on a coaxial cable having a center conductor and a conductive shield. . . the apparatus

16   comprising . . ." '416 Patent, col. 9, line 27-col. 10, line 4.  This language is essential for

17   understanding the means-plus-function claim limitations then described.  Claim 2's "bias means," for

18   instance, refers to the "the conductive shield of the coaxial cable," relying on the preamble as both

19   antecedent and structural context for the "bias means."  The body of the claim similarly refers to "the

20   center electrode" (stipulated by the parties at claim construction to be the equivalent of "center

21   conductor") and "the conductive shield," in reference to the antecedent introduction of those terms in

22   the preamble.  Without the preamble's linking of the "center conductor" and "conductive shield" as

23   part of the "coaxial cable," the relationship between those three terms in the body would be

24   unidentified.  The '416 Patent thus clearly falls at one end of the spectrum identified by the Federal

25   Circuit in Eaton, where limitations in the body of a claim "rely upon and derive antecedent basis

26   from the preamble," such that "the preamble may act as a necessary component of the claimed

27   invention."  323 F.3d at 1339.  The body of claim 2 does not set out the complete invention such that

28

14

1   the preamble could be deleted, making the language of the preamble a necessary key to the claim's

2   meaning.  See id.; Intertool, 369 F.3d at 1295.

3          The Patent Office appropriately believed that the language of the preamble was central to

4   understanding the claims, because the prosecution history reveals amendment of the preamble.  See

5   AudioQuest Req. for Judicial Notice at MON 7 (in response to the Patent Office's rejection of all of

6   the inventor's claims, the patentee amended the claim for the biased cable apparatus to add the

7   language "voltage varying" to the preamble's introduction of the "electrical signal").  The

8   prosecution history's concern for the language of the preamble provides further evidence that it was

9   understood as intertwined with the body of the claim.  See Intertool, 369 F.3d at 1295.

10          Terms in the preamble of claim 2 are therefore essential to performance of infringement

11   analysis.  At claim construction, both parties and the court recognized this fact, and this court

12   construed a number of terms from the preamble.  The very language of the claim which gave the

13   terms importance for claim construction signifies their importance for purposes of infringement.  See

14   Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1306 (Fed. Cir. 1999) (finding that the

15   preamble before the court was "of no significance to claim construction because it cannot be said to

16   constitute or explain a claim limitation").

17          The court thus proceeds to evaluate infringement by the accused devises as to (1) a "coaxial

18   cable," (2) a "center conductor," (3) a "conductive shield," (4) a "means for applying the electrical

19   signal," and/or (4) a "bias means."

21   III.      Literal Infringement of Claim 2

22          Summary judgment of noninfringement requires that, on the proper claim construction, "no

23   reasonable jury could have found infringement on the undisputed facts or when all reasonable factual

24   inferences are drawn in favor of the patentee."  TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360,

25   1371 (Fed. Cir. 2002).  Establishing literal infringement requires that the patentee show that "all of

26   the elements of the claim, as correctly construed," are present in the accused system.  Id.  To prevail

27   on its motion for summary judgment, plaintiff must show that a reasonable jury would be compelled

28

15

1  to find that every element of the claims at issue is present in one or more of the accused devices.  See

2  Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1299 (Fed. Cir. 2004).

4          A.      Literal infringement of the Patent's "Coaxial Cable" Claim Limitation

5          The court notes that at oral argument plaintiff appeared to concede the lack of viability of the

6  literal infringement theory.  Nevertheless, since the parties have addressed this in their papers, the

7  court addresses it.  The term "coaxial cable" is introduced in claim 2 in the following context: "[a]

8  biased cable apparatus for communicating a voltage varying electrical signal . . . on a *coaxial cable*

9  having a center conductor and a conductive shield."  At claim construction, this court construed the

10  term as a "cable with two conductors that share an axis."  Claim Const. Ord. at 10.  Without need for

11  extrinsic evidence, this court found that in light of the specification and the prior art's use or lack of

12  use of the term "coaxial cable," the term referred to two-conductor cables having a conductive shield

13  and center conductor.  The court construed the transition "having" as appearing in its "closed-ended"

14  sense.

15          AudioQuest argues that claim 2, and this court's construction of the claim, requires that

16  literally infringing cables meet two requirements: (1) they have exactly two conductors and (2) those

17  conductors share an axis.  AudioQuest argues that each accused device has more than two

18  conductors, with total numbers of conductors ranging from four to nineteen, and that the diverse

19  configuration of these multiple conductors means that none of them "share an axis" with the other

20  conductors.  Some cables contain several separately-insulated conductors twisted along the length of

21  the cable, and others use a drain conductor placed horizontally along the length of the cable.  See

22  generally Harley Dec. ¶¶ 5-54.  AudioQuest's Vice President of Product Development testified that

23  AudioQuest does sell coaxial cables as claimed and construed in the patent (i.e. with a center

24  conductor and a conductive shield), but they do not have DBS technology.[3]  See Harley Dep. at

25  181:15-25.  He believed that DBS technology applied to coaxial cables would "blow something up."

26  See id. at 185:13-19.

16

1       Monster Cable makes three primary arguments that AudioQuest's multiple conductor cable

2  can literally infringe the '416 Patent's "coaxial cable" claim element.  First of all, Monster Cable

3  argues that for purposes of infringement, the use of the term "comprising" in claim 2 casts a

4  penumbra so broad that it inflects openness *backwards* in the reading of the claim.  Secondly,

5  Monster Cable argues that the preferred embodiment depicted in the '416 Patent includes a ground

6  reference line which constitutes a third conductor in the apparatus described in claim 2, even if it is

7  not counted for purposes of determining the conductors of the "coaxial cable" included in that

8  apparatus.  Thirdly, Monster Cable argues that multiple conductors in electrical connectivity with

9  one another function as a single conductor and are often counted as one conductor.  The court

10  considers each of these arguments in turn.

11       Monster Cable first argues that use of "comprising" transitioning from the preamble to the

12  body of the claim should inflect open-endedness on the entire claim, allowing a device to infringe

13  where it has additional unclaimed elements such as multiple additional conductors.  In the abstract,

14  this position is sound.  It is true that the '416 Patent can include unclaimed elements beyond the three

15  means-plus-function elements that follow claim 2's use of the term "comprising."  See Gillette Co. v.

16  Energizer Holdings, Inc., 405 F.3d 1367, 1371-72 (Fed. Cir. 2005) (holding that "the addition of

17  elements not recited in the claim cannot defeat infringement" where the use of the open-ended term

18  "comprising" triggers the presumption that recited elements are only a part of the device, that the

19  claim does not exclude additional, unrecited elements).  The use of "comprising" does allow claim 2

20  to "encompass subject matter beyond" what is enumerated by the three means-plus-function

21  elements.  But the antecedent definition of "a coaxial cable having a center conductor and a

22  conductive shield" does not appear after "comprising," in the section of the claim where the

23  penumbra of open-endedness is cast.  Rather, the '416 Patent defines a coaxial cable and its

24  conductors in the preamble, and it locks the conductors into the transition word "having" rather than

25  "comprising."  For the purposes of the number of conductors necessary to infringe, then, Monster

26  Cable's argument ultimately would require the open-endedness of the claim to reach the components

27  of a coaxial cable itself.

28

17

UNITED STATES DISTRICT COURT
For the Northern District of California

1    While <u>Gillette</u>'s statement that "[t]he word 'comprising' transitioning from the preamble to

2    the body signals that the entire claim is presumptively open-ended" can be read to refer literally to all

3    terms that come before and after "comprising" appears, this court has found that such a meaning was

4    not indicated by the facts of that case or its cited precedent.[4]  Such an interpretation would

5    undermine the importance ascribed to a patent drafter's choice of transitional phrases.  Federal

6    Circuit precedent emphasizes that patent drafters know the significance of transitional phrases they

7    employ, using them carefully to limit or expand the scope of the material coming thereafter.  <u>See</u>

8    <u>Gillette</u>, 212 F.3d at 1372 (noting that patent drafters choose their transitional phrases to signal

9    specific meaning); <u>PPG Industries v. Guardian Industries Corp.</u>, 156 F.3d 1351, 1354 (Fed. Cir.

10   1998) (same).  <u>See also</u> <u>Vehicular Technologies Corp. v. Titan Wheel Intern.</u>, 212 F.3d 1377, 1383

11   (Fed. Cir. 2000) (Rader, J., concurring) ("A skilled patent drafter would readily foresee the limiting

12   potential of 'consisting of two concentric springs' limitation.")  Certainly no patent drafter would

13   place a word such as "comprising" *after* the elements that he or she meant to cast openly.  Nothing in

14   the case law of the Circuit stands for the proposition the use of the word "comprising" anywhere in a

15   patent claim inflects a presumption of open-ended meaning backwards into prior portions of the

16   claim governed by other transitional phrases.

17   AudioQuest accurately analogizes Monster Cable's argument on this point to a question

18   before the Federal Circuit in <u>Vehicular Technologies Corporation v. Titan Wheel International, Inc.</u>,

19   212 F.3d 1377 (Fed. Cir. 2000).  In that case, the Circuit considered a claim that used "comprising"

20   to transition from the preamble to the body, but within the body of the claim included a "spring

21   assembly consisting of two concentric springs" limitation.  <u>Id</u>. at 1379.  By limiting the claim for "a

22   spring assembly" to embodiments with two springs, the Circuit applied very similar claim

23   construction reasoning as that employed by this court in defining coaxial cable as a "having term"

24   rather than a "comprising" term.  <u>See id</u>. at 1382 (holding that "[t]he claim language expressly

25   requires two springs.  Moreover the patent drafter underscored this limitation with the introductory

26   phrase 'consisting of'"); Claim Const. Ord. at 7-8.  The fact that "comprising" had appeared even

27   *before* the use of "consisting of"—rather than after as in the '416 Patent's claim 2—did not cast a

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   penumbra of open-endedness over the entire claim, as Monster Cable would argue.  The Circuit

2   affirmed an order of summary judgment of noninfringement for competitors, finding that with a

3   claim thus limited, no reasonable jury could either literal infringement or infringement by

4   equivalents with an accused device that was not "two concentric springs" or a structure

5   "insubstantially different from that."  Id. at 1383.  Monster Cable's line of reasoning on this issue,

6   therefore, is ultimately a request that this court either revise claim construction or ignore it for

7   purposes of infringement.  Neither tact is supported by the law of the Federal Circuit.

8        Monster Cable argues that even if "having" is the relevant construct for the number of

9   conductors, the term "having" can be used in such a way that "the inclusion of additional

10  components . . . do not render the device non-infringing."  See Lampi Corp. v. American Power

11  Products, Inc., 228 F.3d 1365,  1376 (Fed. Cir. 2000).  Yet this rule only applies where "having" has

12  been construed in its "open" rather than "closed" sense.  In Lampi, the Federal Circuit specifically

13  held that "having" was properly understand in its "open" rather than "closed" sense in the patent at

14  issue.  Id.  In construing the '416 Patent, by contrast, this court interpreted "having" in the closed

15  sense.

16       Monster Cable raises two additional arguments for why the '416 Patent's apparatus involving

17  a coaxial cable might be literally infringed by multi-conductor cables.  First, Monster Cable argues

18  that a "coaxial cable" with two conductors is merely a *component* of the entire "biased cable

19  apparatus," which may have additional conductors.  Indeed, Monster Cable argues that the apparatus

20  described by claim 2 and depicted by figure 9 can only be practiced by a cable with at least three

21  conductors.  The figure includes a "ground reference line" that is not part of the "coaxial cable"

22  named in the Patent, because it does not share an axis with the other conductors.  See Monst. Cab.

23  Cross-Mot. at 3; June 6, 2005 Blesser Dec. ¶ 54.  Dr. Blesser's explanation for this ground line is

24  that in order to be useful as an audio cable, the basic cable depicted in figure 9 (which had a center

25  and an enclosing conductor and a bias) must have a means for passing audio signals bearing voltage

26  or current from a device at one end of the apparatus to a device at the other end.  Id. ¶ 43.  He stated

27  that in order to perform this function, the apparatus needed an additional ground line or other added

28

conductor.  Id.  This testimony is undisputed in the record, and it does not contradict this court's construction of the term "coaxial cable" that the apparatus as a whole included the ground reference line.  At claim construction, Monster Cable conceded and this court's order reasoned that the ground reference line depicted and described in the patent could not "share an axis" with the center conductor and the conductive shield.  See Claim Const. Ord. at 9, n.4.  Therefore, "the preferred embodiment of a coaxial cable in the '416 Patent necessarily excludes the ground reference line from the count of conductors."  Id. at 9.  Rather, the ground reference line is captured by the fact that the "bias cables apparatus" includes a "ground reference means."  The court therefore agrees with Monster Cable that the "bias cable apparatus" may include one or more conductors that perform the "ground reference means," such as the ground reference line depicted in figure 9.[5]  It does not, however, change the count of conductors that make up the "coaxial cable" element of the apparatus.

Monster Cable's final argument is that multiple conductors in electrical contact with one another must be considered "one conductor" for purposes of literal infringement.  This argument contradicts the terms of the patent as construed and the pattern of counting and labeling each "conductor" in the patent.  As discussed in this court's claim construction order, the patentee expressly chose the term "coaxial cable" rather than the "multiple-conductor" cables referenced in the prior art.  Claim Const. Ord. at 9.  He chose to label his cable a "coaxial cable," rather than describing it simply as a "cable" and specifying its component conductors, as the cited prior art 4,538,023 Patent had done (referring to a "cable consist[ing] of a plurality of conductors" in the context of audio cable technology).  See Behun Dec., Exh. E, U.S. Patent No. 4,538,023 at col. 3, lines 25-28.  In addition, the patentee defined a "coaxial cable having a center conductor and a conductive shield," which, for the reasons enumerated, this court construed as a close-ended term.  Claim Const. Ord. at 7-10.  Even where conductors are in electrical contact with one another, the '416 Patent expressly names and specifies each conductor.  See, e.g., '416 Patent, col. 4, lines 44-48.  As discussed infra, Monster Cable's argument about the function, way, and result multiple conductors operate is squarely relevant to an application of the doctrine of equivalents.  For purposes

1    of literal infringement analysis, however, the patent's limitation of the cable to two conductors can

2    only mean two.

3           Most importantly, in the context of literal infringement, Monster Cable's arguments would

4    nullify the use of the word "coaxial" to describe the cable in claim 2, and they would eviscerate this

5    court's construction of any meaning.  By focusing on whether the AudioQuest cables have a

6    conductive shield and a center conductor somewhere in the cable, Monster Cable's arguments

7    obfuscate the essential question: whether the AudioQuest cables are "coaxial," construed by this

8    court to mean that they only have a conductive shield and center conductor, within the context of a

9    "biased cable apparatus" that also has a ground reference line.  The term "coaxial cable" would have

10   no meaning whatsoever—and certainly not the meaning ascribed to it by the '416 Patent—if it

11   referred to "two conductors that shared an axis" in a system or cable that contained inner and/or

12   outer conductors other than the conductive shield, center conductor, and ground reference means.

13   Monster Cable's argument that this court construe "coaxial cable" to contain *at least* one inner and

14   one outer conductor that share an axis was already deemed incorrect at claim construction based on

15   limitations ascribed by the patentee himself.  As discussed therein, this court is at loss to see why,

16   under such a reading of the patent, an invention would be referred to as a "coaxial cable" rather than

17   using the terms "cable" or "multiple-conductor cable" as described in prior art.  Monster Cable has

18   submitted nothing in the record or its arguments to resolve this concern.[6]

19          Situated in the proper understanding of the claim limitation "coaxial cable," AudioQuest

20   products do not infringe on this element.  Counting each conductor in the cables separately, the

21   AudioQuest cables have conductor geometries ranging from four to nineteen conductors.[7]  Not a

22   single one of these devices can be limited to a conductive shield and a center conductor (as well as a

23   ground reference means conductor).  Even the cables which Monster Cable identified as including

24   the simplest conductor geometries, the families of the Hawk Eye and Eagle Eye Digital Interconnect

25   Cables and the Original Analog Interconnect Cables, cannot infringe under the proper understanding

26   of the "coaxial cable" limitation.  See Mons. Cab. Cross-Mot. at 19.  These digital cables include a

27   conductor in the middle of the cable, an un-insulated drain conductor, an outer aluminum foil layer, a

28   conductive PVC layer, a silver-plated copper layer, and a copper foil layer.[8]  Id. ¶ 50.  The second

United States District Court
For the Northern District of California

1   group, the Analog Interconnect Cables, whether balanced or unbalanced, include three signal

2   conductors, an un-insulated drain conductor, a "Power Anode" conductor, and an aluminum foil or

3   copper foil layer. Id. ¶¶ 6, 11-13.  Without aggregating groups of conductors according to electrical

4   connectivity, Monster Cable has not placed a single item of evidence in the record to defeat the

5   literal noninfringment of these accused cables.

6        Therefore, because all of the accused cables include much more diverse and elaborate

7   conductor geometries than an inner conductor, an outer conductor, and a ground reference line, the

8   court finds that no reasonable juror could find that these products literally infringe on claim 2's

9   limitation of a coaxial cable.

10

11  IV.    Infringement of Claim Limitations under the Doctrine of Equivalents

12        "Even if an accused product does not literally infringe the asserted claims of a patent, the

13  product may infringe under the doctrine of equivalents if the differences between the element of the

14  accused product at issue in the product and the claim limitation at issue are insubstantial." Schoell v.

15  Regal Marine Industries, Inc., 247 F.3d 1202, 1209 (Fed. Cir. 2001).  To determine whether the

16  differences are insubstantial, courts may apply the so-called "function-way-result" test, asking

17  "whether the element performs substantially the same function in substantially the same way to

18  obtain substantially the same result as the claim limitation." Id. at 1209-10.  It is a plaintiff's burden

19  to prove equivalence at trial, and thus in the present case, it is Monster Cable's burden to "set forth

20  specific facts showing that there is a genuine issue for trial" whether the DBS system cables are

21  insubstantially different from the coaxial cables claimed in the '416 Patent. See id.; Fed. R. Civ. P.

22  56(e) ("When a motion for summary judgment is made and supported ..., an adverse party ... must set

23  forth specific facts showing that there is a genuine issue for trial").

24        The scope of the doctrine of equivalents can be narrowed by the legal doctrine of prosecution

25  history estoppel or proscribed by the "all elements" rule. Lockheed Martin Corp. v. Space

26  Systems/Loral, Inc., 324 F.3d 1308, 1320 (Fed. Cir. 2003).  Under the doctrine of prosecution history

27  estoppel, the patentee is barred from asserting equivalents if an amendment was made to secure the

28  patent and the amendment narrowed the patents scope. Honeywell Intern. Inc. v. Hamilton

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Sundstrand Corp., 370 F.3d 1131, 1139 (Fed. Cir. 2004).  The "all-elements rule" instructs that there

2   can be no infringement under the doctrine of equivalents if even one limitation of a claim or its

3   equivalent is not present in the accused device.  Lockhead, 324 F.3d at 1321.  The doctrine of

4   equivalents must be applied to individual elements of a claim, not to an invention as a whole.

5   Warner-Jenkinson, 520 U.S. at 29.  Therefore, the court cannot make a finding of infringement under

6   the doctrine that would "vitiate a particular claim[ed] element."  Lockhead, 324 F.3d at 1321.

7

8        A.    Infringement of the "Coaxial Cable" Claim Limitation under the Doctrine of

9             Equivalents

10       Monster Cable raises several arguments that the accused devices meet the "coaxial cable"

11   limitation under the doctrine of equivalents.  First of all, Monster Cable argues that the term "coaxial

12   cable" in the context of the claim language entitles the patentee to a broad scope of equivalents.

13   Secondly, Monster Cable argues that multiple conductors in electrical contact with one another are

14   insubstantially different from one conductor.  Thirdly, Monster Cable argues that when complex

15   arrangements of conductors placed in electrical contact with one another are understood to constitute

16   a single conductor, each accused device can be understood to have only one center conductor and

17   one conductive shield.

18       It is now familiar doctrine that the range of equivalents due to a patent cannot be divorced

19   from the scope of the claims.  In the context of an analogous patent with a "spring assembly

20   consisting of two concentric springs," in which the court construed the assembly to expressly require

21   two springs and not more, the Federal Circuit noted two key rules.  See Vehicular Technologies, 212

22   F.3d at 1382-83.  The court held that the restrictive claim language did not foreclose infringement

23   under the doctrine of equivalents, but did "specifically require that an infringing device consist of

24   two springs (either literally or equivalently)."  Id. at 1383.  In addition, the concurring opinion of the

25   court emphasized that a skilled drafter would have "reasonably foreseen potential substitutes" for the

26   two spring system because the inventive feature was relatively simple and did not call into question

27   issues of after-arising technology.  Id. at 1384 (Rader, J., concurring).  Monster Cable's arguments to

28   distinguish Vehicular ring hollow.  The fact that Vehicular concerned an accused device with less

23

than the specified number of components, rather than an accused device containing additional components, as is the case here, does not reflect the basis of the court's holding: the closed-end construction of the term.

As in Vehicular, no issue of after-arising technology would expand the scope of equivalents due to the '416 Patent. Complex, multiple-conductor geometries predated the patent, and indeed such configurations were captured in the prior art cited by the '416 Patent. The policy for protecting a patentee from later-developed technologies, which underlies the doctrine of equivalents, would not apply. See Chiuminatta Concrete Concepts, Inc. v. Cardinal, 145 F.3d 1303 (Fed. Cir. 1998) ("The doctrine of equivalents is necessary because one cannot predict the future. Due to technological advances, a variant of an invention may be developed after the patent is granted, and that variant may constitute so insubstantial a change from what is claimed in the patent that it should be held to be an infringement"). The patentee could therefore have claimed a cable with more than two conductors, but conspicuously failed to do so.

Turning to the actual question of infringement under the doctrine of equivalents, the court proceeds to apply the function-way-result test. See Schoell, 247 F.3d at 120-10. As for function, claim 2 describes "[a] biased cable apparatus for communicating a voltage varying electrical signal from an output of a first electrical signal to an input of a second electrical device on a coaxial cable...." The parties dispute the function of the "coaxial cable." AudioQuest argues that the function of the coaxial cable is "communicating a voltage varying electrical signal from an output of a first electrical device to an input of a second electrical device." Monster Cable argues that this language actually refers to the function of the "biased cable apparatus," while the function of the coaxial cable is simply "biasing a dielectric" (language which is not found in the '416 Patent). This argument defies logic. The function of "communicating [the electrical signal]" is one small portion of the function of the entire apparatus. This aspect of the apparatus's function is performed "on a coaxial cable." The coaxial cable's function is to transmit the electrical signal, while the entire apparatus has a much broader function, namely to apply voltage to components of that signal-carrying cable so as to improve the sound quality. The function of the "coaxial cable" is therefore "communicating a voltage varying electrical signal from an output of a first electrical device to an

24

1 input of a second electrical device." The record before this court indicates that AudioQuest cables

2 share this function, and there is no dispute that these cables do in fact communicate audio signals

3 (which are voltage varying) from an output of a first electrical device to an input of a second

4 electrical device. Therefore, their function, as well as the result of that performance, are

5 insubstantially different than the function and result of the claim limitation "coaxial cable."

6    However, Monster Cable has provided little in the record to show that the *way* AudioQuest

7 cables perform this function is insubstantially different. Monster Cable's argument for equivalence

8 between the way the AudioQuest cables perform their function and the claim limitation is essentially

9 this: because multiple conductors in electrical contact with one another act as a single electrical

10 entity/conductor, there are no substantial differences between cables with a plurality of conductors

11 and those with only two. To confine this argument within the boundaries of the claim limitation "a

12 coaxial cable having a center conductor and a conductive shield," Monster Cable must show that

13 groups of conductors in electrical contact perform two roles: the roles of the "conductive shield" and

14 the "center conductor." AudioQuest argues that such a multi-conductor equivalence theory is

15 inconsistent with the figures and terms of the patent, which depict conductors in electrical contact

16 with one another but count or name these conductors separately. See, e.g. '416 Patent, col. 4, lines

17 44-48.

18    Experts for both sides agree that multiple conductors in electrical contact with one another

19 act as a single conductor. Dr. Blesser's declaration attested that "the number of conductors used for

20 purposes of audio technology may vary vastly in number, shape and size due to the low frequency

21 requirements for audio technology." June 7, 2005 Blesser Dec. ¶ 15. Further, he stated that "the two

22 conductor coaxial cable of the '416 Patent was easily interchangeable with the four to nineteen

23 conductor coaxial cable at the time the Accused Products were made." Id. AudioQuest's expert at

24 claim construction stated that the concept of a conductor could take many forms, such that many

25 conductors could function as one. See February 22, 2005 Villasenor Dec. ¶ 15. Dr. Villasenor

26 stated: "A person of skill in the art would understand that a 'conductor' could take a number of

27 different forms. For example, the outer conductive shield could be a solid sheath, or it could be a

28 braided mesh-like sheath composed of many extremely fine wires overlapping each other in complex

25

1   patterns.  A close examination of such a mesh would reveal that while many individual 'strands'

2   might be present in it, all of the strands are nonetheless in electrical contact with each other and that

3   the sheath would therefore only carry one voltage level.  The sheath, whether solid, braided, or

4   otherwise, is a single electrical entity and is therefore a single conductor."  Id.  The court thus finds

5   the testimony undisputed in the record that multiple conductors in electrical contact act as a single

6   conductor.

7        However, this physical reality does not address the question of equivalence for the "coaxial

8   cable" claim limitation.  As construed by this court, the inventor of the '416 Patent confined the

9   "coaxial cable" claim limitation of his patent, thereby distinguishing his invention from prior art the

10  referenced multiple conductors or "pluralities" of conductors.  In order for the accused devices to be

11  insubstantially different from the claim limitation in the context of the construction of "coaxial

12  cable" as a cable with two conductors, and only two conductors, each of which share an axis, they

13  must contain: (1) either a single-conductor "conductive shield," or one or more conductors in

14  electrical contact which act as a single "conductive shield," and (2) either a single center conductor,

15  or one or more conductors which act as a single center conductor.  In addition, as discussed, they

16  may contain one or more conductors in electrical contact with one another that act as a single ground

17  reference line.

18       Arguing that AudioQuest is falsely counting its conductors to range as high as nineteen per

19  cable, Monster Cable applies its principle of electrical connectivity to recount the number of

20  conductors in each accused device.  In other words, Monster Cable argues that if counting each set of

21  multiple conductors in electrical contact as a single conductor, the range of conductors in the accused

22  devices is actually from three to six, rather than four to nineteen.  Monster Cable and its expert

23  analyzed the schematics in the record to argue that in the six simplest accused devices,[9] the count of

24  conductors is "effectively" three, including a conductor at the geometric center of the cable, a

25  grounded conductive shield, and a third inner conductor twisted around the middle of the cable.  See

26  June 6, 2005 Blesser Dec. ¶ 37; Monst. Cable. Cross-Mot. at 19-20 (citing Harley Dec. ¶¶ 8-9).  The

27  group of six cables identified in this "three conductor" category includes the Hawk Eye and Eagle

28  Eye Digital Interconnect Cables and the four Original Analog Interconnect Cables when sold as

unbalanced cables.  Id.  Even construing the record evidence in the light most favorable to Monster

Cable, and based on the undisputed fact in the record that conductors in electrical contact act as a

single entity, the distillation of the conductors within these AudioQuest cables demonstrates that no

reasonable jury could find that the devices contain equivalents of "coaxial cables" as used in the '416

Patent.  The Hawk Eye and Eagle Eye cables have a conductor running through the middle of the

cable that is not in electrical contact with other conductors, a spiral shield in electrical contact with a

layer of conductive copper foil, and a drain wire in electrical contact with a layer of aluminum foil.

See Harley Dec. ¶ 50-51, Exhs. NN, PP.  These cables thus have two sets of outer conductors that

might constitute a "conductive shield" (one of which is grounded, the other of which is connected to

the positive terminal of a battery) and a center conductor.  See id.  Relying on Monster Cable's

expert's identification of the functions of each conductor in these cables, the grounded outer layer of

conductors serves as the conductive shield and ground reference line.  See June 6, 2005 Blesser Dec.

¶ 37.  This leaves two other conductors in the device: the conductive layer including the electrically

connected silver-plated copper spiral and the copper foil (which carries the positive audio signal) and

a conductor at the geometric center of the cable which is connected to the negative terminal of the

battery.  Id.  One of these latter two conductors thus defeats the two-conductor limitation of "coaxial

cable," even putting aside the question of whether they perform the functions construed to apply to

"center conductors" or "conductive shield" in the patent.  Applying the same principle of electrical

connectivity to the unbalanced versions of the four Original Analog Interconnect Cables, the

conductor count would include at minimum four conductors: three signal conductors (each of which

is insulated) that connect to two separate pins or shells of the RCA terminal connector (therefore

counting as two conductors), a drain conductor electrically-connected to a layer of aluminum foil,

and an insulated middle conductor.  See Harley Dec. ¶¶ 6-9, Exhs. A, C, E, and G.  Therefore, the

Hawk Eye and Eagle Eye cables and Original Analog Interconnect Cables cannot infringe on the

coaxial cable limitation of the patent.

Even Monster Cable's own recount of conductors in other accused devices demonstrates that

these have even more diverse conductor geometries that could not infringe under the doctrine of

equivalents.  Monster Cable identifies a second set of cables, the balanced versions of the Analog

1    Interconnect Cables,[10] that it counts as effectively having four conductors, including an insulated

2    Power Anode, a positive signal conductor, a negative signal conductor, and a grounded conductive

3    shield.  See Harley Dec. at ¶ 7, Exh. A.  Another set of cables[11] each has at least four conductors,

4    including a center conductor, a grounded signal return, a dedicated bias conductor, and a forth

5    conductive element of various configurations.  See id. ¶¶ 17, 19, 23, 34, 41, and 43.  This is the same

6    for an additional two cables,[12] except that these products have "two cable portions," each with this

7    configuration.  See id. ¶ 47.  Five cables[13] effectively have at least five conductors, including a center

8    conductor, a grounded signal return, a conductive shield, and a dedicated bias conductor.  See id. ¶¶

9    17, 19, 23, 49.  Finally, one last AudioQuest cable[14] has at least six conductors, including left and

10   right pairs of signal conductors, a bias conductor, and a grounded conductive shield.  See id. ¶ 54.

11        Whether these accused devices have from four to six conductors, as Monster Cable argues, or

12   six to nineteen, as AudioQuest's evidence attests, no reasonable jury could find that these are

13   "coaxial cables" within the meaning of the '416 Patent.  Each of the accused cables contains

14   conductor geometries that are much more complex than a center conductor and conductive shield,

15   and each one contains a "type" of electrical conductor which the "coaxial cable" claim limitation

16   excludes.  Nothing in the record supports the principle—either as a matter of science or as a matter

17   of claim interpretation—that these additional conductors or conductor sets represent an equivalent

18   "way" of performing the claimed function, and therefore Monster Cable has failed to carry its burden

19   to show infringement under the doctrine of equivalents.  TechSearch, L.L.C. v. Intel Corp., 286 F.3d

20   1360, 1372 (Fed. Cir. 2002) ( "[G]eneral assertions of facts, general denials, and conclusory

21   statements are insufficient to shoulder the non-movant's burden" to show infringement literally or

22   equivalently for each limitation).  Under the application of Vehicular described in this order, the '416

23   Patent is not entitled to claim infringement where these additional conductor elements are included.

24   In addition, no reasonable jury could find that these complex conductor geometries are equivalent to

25   a coaxial cable with one conductive shield and one center conductor that share an axis in the context

26   of a patent citing prior art that claims diverse conductor configurations as means to achieve more

27   specialized results in the audio technology context.

28

28

Monster Cable has therefore not carried its burden to "set forth specific facts showing that there is a genuine issue for trial" as to whether AudioQuest cable geometries perform the function of the claimed "coaxial cable" in the same or insubstantially different way as captured in the claim limitations.  See Schoell v. Regal Marine Industries, Inc., 247 F.3d 1202, 1210 (Fed. Cir. 2001) ("The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent").  AudioQuest is therefore entitled to summary judgment of noninfringement on this claim limitation.

CONCLUSION

For the foregoing reasons, AudioQuest's motion for summary judgment for noninfringement is GRANTED and Monster Cable's cross-motion for summary judgment is DENIED..

IT IS SO ORDERED.

Date:   August 8, 2005

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

1

**ENDNOTES**

2  1.  Martin obtained the patent in 1992, while working as an audio engineer at Crosby Audio Works.
Shortly after Martin moved to Monster Cable in 1996, the company purchased the patent from
3  Crosby Audio Works.

4  2. As discussed herein, the court misstated the parties' agreement in the claim construction order.
The correct summary of the parties' agreement should have read that the structures of figure 9
5  corresponding to the bias means included: (1) the voltage source 190, (2) the unlabeled conductor or
device connecting the voltage source to the conductive shield, and (3) the unlabeled conductor or
6  device connecting the voltage source to the ground reference line.

7

8  3. Monster Cable has loosely asserted that Mr. Harley's "testimony is incompetent," but it has not
brought a Daubert motion to exclude this evidence based on reliability concerns.  See Imonex
9  Services, Inc. v. W.H. Munzprufer Dietmar, 408 F.3d 1374, 1381 (Fed. Cir. 2005) (upholding a
district court's admission of expert testimony where the challenging party gave no grounds for
10  excluding the person's testimony based on the factors enumerated in Daubert v. Merrell Dow
Pharms., Inc., 509 U.S. 579, 592-95 (1993)).  His testimony thus is admissible, and Monster Cable's
11  concerns merely amount to a credibility attack not appropriate on a motion for summary judgment.

12

13  4. To the extent Monster Cable is seeking to reopen claim construction on the term "coaxial cable,"
this court soundly rejects its arguments.  As this court emphasized in its claim construction order and
14  re-emphasized in its denial of Monster Cable's motion to reconsider, "coaxial cable," which appears
in the preamble, must be construed without the influence of the word "comprising" which transitions
15  from the preamble to the body, based on a fundamental precept of English grammar: paragraphs do
not read backwards.  "Comprising" cannot be read in reverse to inflect its open-ended meaning on
16  contested terms that were used *before* "comprising" appears in the claim.  Nothing in the recent
Federal Circuit decision Gillette is inconsistent with this court's reasoning in the claim construction
17  order.  The court in Gillette indeed stated that "[t]he word 'comprising' transitioning from the
preamble to the body signals that the entire claim is presumptively open-ended."  Gillette Co. v.
18  Energizer Holdings, Inc., 405 F.3d 1367, 1371 (Fed. Cir. 2005).  Yet the underlying patent in Gillette
employed a five-word preamble: "A safety razor blade unit comprising. . ." Id. at 1369.  The Federal
19  Circuit did not construe the terms "safety razor blade unit" to be open-ended because of the presence
of "comprising" thereafter.  Rather, the court construed language that appeared *after* "comprising"
20  ("comprising . . . a group of first, second, and third blades"), adhering to a long line of precedent in
which "comprising" renders "downstream" terms open-ended.  In so doing, Gillette cited and thereby
21  preserved the very case upon which this court relied in interpreting the effect of "having" on
construction of "coaxial cable."  See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l,
22  Inc., 246 F.3d 1336, 1347-8 (Fed. Cir. 2001).

23

24

25  5. In addition, though it does not seem to be disputed by either party, a device infringing on biased
cable apparatus could also have additional elements such as various insulators and fillers, as the
26  patentee did not impose any limitations relating to these cable elements.  Where the claim did not
otherwise limit these components, the use of the word "comprising" would encompass such
27  additional pieces.

28

6. Dr. Blesser's declaration on this point is nothing but conclusory statements repeating Monster Cable's masked requests to reopen claim construction and find that a "two conductor" coaxial cable could be literally infringed by a nineteen conductor cable. He simply restates Monster Cable's theory that "comprising" should inflect openness backwards in a claim, trumping potentially closed-ended words used earlier in the patent. See June 7, 2005 Blesser Dec. at ¶ 14, 53.

7. Specifically, the conductor counts are as follows. The Original Analog Interconnect Cables have six conductors. Harley Dec. ¶ 6. The New Analog Interconnect Cables and the Sub-3 Analog Interconnect Cable have eight conductors. Id. ¶¶ 15, 23. Eleven conductors are included in each Original Kilimanjaro, Mont Blanc, and Pike's Peak Speaker Cable. Id. ¶ 30. The new generation of these cables have the same eleven conductors, as well as an additional outer conductor and drain conductor. Id. ¶ 33. The Original Volcano and Everest Speaker Cables have eighteen conductors, and the new generation of these cables increases that count to nineteen. Id. ¶¶ 37, 40. The CV-4, KE-4, CV-6, and KE-6 Speaker Cables have seven conductors. Id. ¶ 43. Each Gibralter and Rockefeller Speaker Cable has two cable portions, each of which has seven conductors. Id. ¶ 46. The Raven Digital Interconnect Cable has seven conductors. Id. ¶ 49. Finally, the Hawk Eye and Eagle Eye Digital Interconnect Cables have four conductors while the Leopard Tone Arm Cable has six. Id. ¶ 50.

8. As discussed infra, even when electrical connectivity is taken into account, this cable could not infringe on the "coaxial cable" element.

9. These include: the Original Jaguar, Panther, Cheetah, and Sky cables, when sold in RCA, or unbalanced cable form; the Eagle Eye and Hawk Eye cables.

10. This set includes: the Original Jaguar, Panther, Cheetah, and Sky cables, when sold in XLR, or balanced cable form.

11. These group is: the New Jaguar, Panther, Cheetah, and Sky cables, when sold in RCA, or unbalanced cable form; the New Kilimanjaro, Mont Blanc, Pike's Peak, Volcano and Everest cables; the CV-4, KE-4, CV-6, and KE-6 cables.

12. These are the Gibralter and Rockefeller cables.

13. These are the New Jaguar, Panther, Cheetah, and Sky cables, when sold in XLR, or balanced cable form; the Raven Cable.

14. This includes the Leopard Tone Arm cable.

31